UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| T.D. FARRELL CONSTRUCTION, INC., | § | |
| | § | |
| *Appellant*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-08-642 |
| | § | |
| WENDY M. SCHREIBER, | § | |
| | § | |
| *Appellee.* | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | JOINTLY ADMINISTERED |
| WENDY M. SCHREIBER | § | UNDER BANKRUPTCY CASE NO. |
| | § | 06-30361 |
| *Debtor* | § | |
| | § | |
| | § | |

## ORDER

Pending before the court is appellant T.D. Farrell Construction, Inc.'s appeal (08-642, Dkt. 3) from the bankruptcy court's order denying summary judgment for T.D. Farrell Construction, Inc. and granting summary judgment for appellee–debtor Wendy M. Schreiber. 06-3681, Dkts. 54, 59. The bankruptcy court also ruled that T.D. Farrell Construction Inc. lacked standing to pursue its objections to discharge. *See* Dkt. 06-3681 (reflecting ruling in an unnumbered minute entry).

After considering the parties' briefs, the record on appeal, and the applicable law, the court AFFIRMS the denial of summary judgment for T.D. Farrell Construction, Inc. and REVERSES the bankruptcy court's grant of summary judgment for Wendy M. Schreiber.

## I. BACKGROUND

**A. History of The Parties**

T.D. Farrell Construction, Inc. ("T.D. Farrell") was hired as the general contractor on the construction site of a Home Depot in Corpus Christi, Texas (the "Home Depot Project"). 06-3681, Dkt. 1. From December 2002 through June 2003, site preparation work was conducted on the Home Depot Project. 08-642, Dkt. 3. T.D. Farrell subcontracted the site work to Cyril B. Strum ("Strum"), doing business as Monitor Trust Contractors ("Monitor Trust") on December 23, 2002. 06-3681, Dkt. 1. On January 6, 2003, Monitor Trust, in turn, entered into a subcontract with Town & Country Excavation Services, Inc. ("Town & Country"), a provider of excavation, site preparation, and utility installation services. 06-3681, Dkt. 1.

On the Home Depot Project, Monitor Trust also subcontracted rights to bill for work, receive payment for work, and disburse payments received to Town & Country.[1]  *Id.*  T.D. Farrell would make payments to Monitor Trust and, once the funds were available to Monitor Trust, Town & Country would distribute them to other subcontractors and suppliers of labor and materials ("Third Tier Subcontractors"). *Id.*

Debtor, Wendy M. Schreiber ("Schreiber"), served as an officer (Secretary) and director of Town & Country. Schreiber also held a significant share of Town & Country stock. *Id.* As Town & Country's Secretary, Schreiber was responsible for signing all checks to be paid from Town & Country's account. 06-3681, Dkts. 1; 34, Ex. A. Schreiber testified that Kurt Codding ("Codding"),

---

[1] Although T.D. Farrell alleges that Monitor Trust and Town & Country "acted as one" on the Home Depot Project, the bankruptcy court did not concur with the characterization. *See* 06-3681, Dkts. 25, 54.

Town & Country's President and only other shareholder,[2] was also a signatory on the account. However, when Town & Country ceased operations, Schreiber signed approximately twenty blank checks on the Town & Country account, per Codding's request.  Schreiber believed that Codding, at some point, may have been removed as a signatory on the account.  Schreiber's examination also revealed that Connie Aiken ("Aiken"), Town & Country's office manager, would discuss bills and the corresponding amount of each bill with Codding.  Aiken would then write the checks, enter the amounts into QuickBooks, and bring the checks to Schreiber for her signature.  06-3681, Dkt. 34, Ex. A.  Schreiber characterized herself as an "office manager," primarily responsible for the day to day operations and finances, maintaining that she operated at the direction of Codding.  06-3681, Dkts. 1, 25.  Schreiber described her role as a signatory as one of convenience, designed to facilitate operations while Codding was out of the office.  06-3681, Dkt. 34, Ex. A.

Kevin Robinson ("Robinson"), who was also affiliated with Monitor Trust in an operational or managerial capacity, also represented himself as both the "Operations Manager" and "Vice President of Operations" for Town & Country.  06-3681, Dkt. 1.  Robinson, however, took no part in the formation or dissolution of Town & Country.  Schreiber depicted Robinson as a "consultant" to Town & Country, who obtained a portion of project proceeds before the remainder was distributed between Schreiber and Codding.  06-3681, Dkt. 34, Ex. A.  However, she also characterized him as an "officer" of Town & Country.  06-3681, Dkt. 34, Ex. O.  Robinson and Schreiber maintained a personal relationship and share two children.  06-3681, Dkt. 1.

---

[2] Initially, a third shareholder was involved.  However, the shareholder resigned from Town & Country and the shares were allocated between Schreiber and Codding.  06-3681, Dkt. 34, Ex. A.  The exact reallocation of shares is unclear.  *Compare* 06-3681, Dkt. 34, Ex. A (indicating Schreiber owned forty percent of the outstanding shares) *with* 06-3681, Dkt. 34, Ex. O (reflecting Schreiber's fifty percent ownership in Town & Country).

**B. Nature of Claim**

T.D. Farrell brings claims against Schreiber, alleging that Schreiber owes a debt to it as a result of her involvement with Town & Country and the Home Depot Project.  T.D. Farrell asserts that, as a result of Town & Country's nonpayment of the Third Party Subcontractors and T.D. Farrell's subsequent payments to them, it has suffered damages of approximately $469,484.18.  06-3681, Dkt. 1.    Thus, T.D. Farrell objects to the discharge of the alleged debt, relying on the exceptions to discharge outlined in 11 U.S.C. § 523(a) and 11 U.S.C. § 727.

1. The Home Depot Project and Town & Country's Operations

During the course of the Home Depot Project, T.D. Farrell maintains it paid in excess of $800,000 to Monitor Trust, and thus to Town & Country.  *See* 06-3681, Dkt. 34, Ex. L.  Schreiber, however, maintains that Town & Country received only $503,990.53[3] and spent $411,670.38 on the project.  06-3681, Dkt. 25.  The difference is purportedly explained by the ten percent overhead and ten percent profit built into the initial project estimates.  06-3681, Dkt. 25.

Several Third Tier Subcontractors claimed they were not paid for services and materials they provided on the Home Depot Project.  06-3681, Dkt. 1.  Because the Third Tier Subcontractors could obtain liens against the project, T.D. Farrell ultimately paid each subcontractor an agreed amount in exchange for an assignment of each subcontractor's right to payment and to assert violations of the Texas Construction Trust Fund statute.[4]  06-3681, Dkt. 1. Schreiber argues that the payments T.D. Farrell made directly to the Third Tier Subcontractors arose from a disputed change order on

---

[3] Schreiber points to two draws for work completed through January 31, 2003; one check, written on February 5, 2003, and one written on March 6, 2003, totaling $503,990.53.  06-3681, Dkt. 25.

[4] Martin Marietta Materials, one of the Third Tier Subcontractors, received payment as a result of litigation rather than by agreement.  Martin Marietta Materials did not assign its rights to T.D. Farrell.  06-3681, Dkt. 1.

4

the Home Depot Project, and that the work was performed after the last paid draw received from T.D. Farrell. 06-3681, Dkt. 25. Schreiber claims that Town & Country did not receive the payments from T.D. Farrell, and thus did not fail to pay the Third Tier Subcontractors on T.D. Farrell's behalf.

Meanwhile, between July 2003 and August 2004, Schreiber made significant distributions of funds to herself and Robinson. In total, over $200,000 was paid to Schreiber, and over $400,000 was paid to Robinson; however, Schreiber cannot recall specifically the reason for each distribution. 06-3681, Dkt. 34, Exs. A–B. T. D. Schreiber maintains that the distributions were, at least partially, repayment of loans she claims that she and Robinson made to Town & Country. 06-3681, Dkts. 1; 34, Ex. A. Schreiber indicates that documentation and records of the loans and payments should be found in the financial records of Town & Country. These records have not been recovered, although Schreiber did provide a "report" of the loans and repayments generated from Town & Country's financial system. 06-3681, Dkt. 45; *see also* 06-3681, Dkt. 34, Ex. A.

T.D. Farrell alleges that the funds transferred during this time period were used to purchase Schreiber's home in Weimar, Texas, in which Robinson may also own an interest.[5] But, Schreiber insists that the down payment for the home was obtained through savings. 06-3681, Dkt. 34, Ex. A. The home was listed on Schreiber's Schedule A disclosure as having a value of $450,000, and Schreiber indicated a fee simple ownership interest.[6] 06-3681, Dkt. 34, Ex. M. However, Schreiber listed the same property for sale by owner at $575,000, and allegedly later with an agent for $875,000. 06-3681, Dkt. 34, Ex. N.

---

[5] Schreiber testified that Robinson is a co-owner of the property, even though his name does not appear on the title. 06-3681, Dkt. 34, Ex. A. Robinson, however, denies having an ownership interest. See 06-3681, Dkt. 34, Exs. A, J .

[6] The examination testimony suggests some level of calculated decision not to amend the property value on the Schedule A. *See* 06-3681, Dkt. 34, Ex. A.

5

In July 2004, Town & Country ceased operations.  06-3681, Dkt. 1.  When the office closed, Schreiber maintains that all documents were boxed and shipped to Codding.  06-3681, Dkt. 34, Ex. A.  Although Schreiber did not retain any of Town & Country's financial records, she did keep several of her personal expense reports.  *Id.*  The exact location of the vast majority of Town & Country's financial records remains a mystery.  When Town & Country's financial records were requested, Schreiber asked Robinson to ask Codding to return the records he received.  Robinson called, and Codding complied, sending a subset of Town & Country's financial records to Robinson.  Robinson provided the records to Schreiber, who presented the records to her attorney.  Schreiber maintains that, if Town & Country's financial records were destroyed or are being concealed, such conduct is attributable to Codding.  *Id.*

2. <u>Prior Litigation & Pending Litigation</u>

In 2003, T.D. Farrell brought suit against Strum, individually and doing business as Monitor Trust; Martin Marietta Materials Southwest Limited; Contractors Building Supply Company; Town & Country; Timothy Farrell; and Codding, individually, in case number 03-3510-E, in state court in the 148th District Court of Nueces County, in an attempt to recover the payments made directly to the Third Party Subcontractors.  06-3681, Dkt. 57, Ex. F-1; *see also* 06-3681, Dkt. 25.  T.D. Farrell alleged violations of the Texas Construction Trust Fund statute by Strum, Monitor Trust, and Town & Country, specifically.  06-3681, Dkt. 57, Ex. F-1.  Importantly, Schreiber was not named personally in the suit.[7]  Moreover, Schreiber is not mentioned specifically in the state court petition.

---

[7] In fact, based on her communications with Codding, Schreiber was under the (mistaken) impression that Town & Country brought suit against T.D. Farrell.  06-3681, Dkt. 34, Ex. A.

On September 16, 2004, in response to T.D. Farrell's motion for partial summary judgment, the Nueces County court ruled that Town & Country's affirmative defenses and claims, largely based in quantum meruit, be stricken.  Thus, Town & Country was left with only the general denial in its original answer.  06-3681, Dkt. 34, Ex. C.  Subsequently, both Town & Country and Codding failed to appear at trial, which proceeded in their absence.[8]  06-3681, Dkt. 34.  While no transcripts from the trial have been presented to the court, T.D. Farrell did provide the findings of fact, conclusions of law, and final judgment.  06-3681, Dkt. 57.  The Nueces County court found that "[u]nder the Texas Construction Trust Fund Act . . . , MONITOR TRUST and TOWN & COUNTRY and KURT CODDING were trustees of the construction payments made by T.D. FARRELL to MONITOR and TOWN & COUNTRY"; "[c]onstruction trust funds in the amount of $800,000.00 were paid to MONITOR  and TOWN & COUNTRY on the Project" and that "STURM, MONITOR TRUST, CODDING and/or TOWN & COUNTRY directly and/or indirectly retained, disbursed, and otherwise diverted trust funds without first paying all current or past due obligations."  06-3681, Dkt. 57, Ex. F.  Further, the Nueces County court concluded that Sturm and Codding were "control persons" of their respective entities for the purposes of the Texas Construction Trust Fund statue and that the "[f]ailure of MONITOR TRUST and TOWN & COUNTRY to pay the construction trust funds over to the Third-Tier Subcontractors amount[ed] to defalcation of their fiduciary duty established by [the Texas Construction Trust Fund statute]."  *Id.*  Quite noticeably, the findings of fact, conclusions of law, and final judgment issued by the court are wholly devoid of references to Schreiber.

---

[8]Schreiber claims to have not known of the trial setting.

Later, in April 2005, T.D. Farrell brought suit against Schreiber and Robinson, individually, in case number 05-1768-B, in state court in the 117th District Court of Nueces County.  However, no information regarding the case, including the claims asserted against Schreiber and Robinson, has been presented to the court.[9]  This case was stayed after Schreiber voluntarily filed a bankruptcy petition on February 2, 2006.  06-3681, Dkt. 1.

3.  The Adversary Proceeding & Motions for Summary Judgment

T.D. Farrell filed suit against Schreiber, objecting to the discharge of debt allegedly owed by Schreiber to T.D. Farrell through her association with Town & Country and involvement on the Home Depot Project.  T.D. Farrell's proof of claim in the bankruptcy proceeding is based on the default judgment entered against Town & Country in the Nueces County litigation.  06-3681, Dkt. 1.

T.D. Farrell argues that the purported debt should be exempt from discharge pursuant to 11 U.S.C. § 523(a)(4) and (a)(6).  Section 523(a)(4) precludes the discharge of debt arising from "fraud or defalcation while acting in a fiduciary capacity . . . ."  11 U.S.C. § 523(a)(4).  T.D. Farrell relies upon the Texas Construction Trust Fund statute, Texas Property Code § 162.001 *et seq.*, to demonstrate the requisite fiduciary relationship.  T.D. Farrell then argues that Schreiber's payments to herself and Robinson, rather than the Third Party Subcontractors, constituted a defalcation of trust funds.  06-3681, Dkt. 1.

Section 523(a)(6) prohibits discharge of debts resulting from "willful and malicious injury by the debtor to another entity or the property of another entity."  11 U.S.C. § 523(a)(6).  T.D. Farrell

---

[9] Schreiber did file an answer to T.D. Farrell's petition.

asserts that Schreiber had familiarity with the construction industry, knew that liens against the Home Depot Project would result from non-payment of Third Party Subcontractors, and that T.D. Farrell, as the general contractor, would be liable for payment. In her examination, Schreiber admits having years of experience in the construction industry and knowledge of the security interests held by subcontractors. *See* 06-3681, Dkt. 34, Ex. A.  Thus, T.D. Farrell concludes that Schreiber diverted funds to herself and Robinson, without the knowledge or permission of T.D. Farrell, knowing the harm that would befall T.D. Farrell.

Additionally, T.D. Farrell maintains that the debts are not dischargeable pursuant to provisions contained within 11 U.S.C. § 727.  Section 727 prohibits the discharge of debt based on specifically prohibited conduct of the debtor, such as actively destroying or concealing documents, failing to maintain financial records, making a false oath in connection with the bankruptcy proceedings, and failing to explain the loss or deficiency of assets.  *See* 11 U.S.C. § 727(a)(2)(B), 727(a)(3), 727(a)(4)(A), 727(a)(5).   T.D. Farrell maintains that documents were "concealed, destroyed, [and] falsified" by Town & Country.   T.D. Farrell also alleges that Town & Country "failed to keep or preserve any recorded information, including, but not limited to, books, document[s], records, and papers from which debtor's financial condition or business transactions might be ascertained." 06-3681, Dkt. 1.  During the relevant period of Town & Country's existence, the records were kept in Town & Country's office in Katy, Texas, which Schreiber managed.  06-3681, Dkt. 34, Ex. A.

T.D. Farrell also bases the section 727 exceptions on Schreiber's failure to accurately disclosure the value of and ownership interests in her home.  Additionally, T.D. Farrell cites Schreiber's failure to reveal other businesses that she operated in the six-year period prior to the

9

commencement of the bankruptcy proceedings, as is required.  Schreiber omitted both Lantana Services and EGN Services from the required disclosures.  *Id.*

In the course of the adversary proceeding, Schreiber filed a motion for summary judgment, challenging that any debt was owed to T.D. Farrell and maintaining that the amounts allegedly owed arose from a change order and were incurred after the last paid draw.  *See* 06-3681, Dkt. 25 ("T.D. Farrell seeks to collect money it never paid Town & Country, and therefore, that Town & Country never owed the subcontractors paid by T.D. Farrell.").  Schreiber also surmises that, without establishing the requisite debt, T.D. Farrell lacks standing to pursue its objections.

T.D. Farrell responded and filed a cross-motion for summary judgment, emphasizing the exception to discharge under section 523(a)(4) for defalcation of trust funds by a fiduciary.  The crux of T.D. Farrell's response and motion for summary judgment is that the Nueces County court fully litigated the fact issues raised by Schreiber.  Thus, T.D. Farrell argues that Schreiber is collaterally estopped from relitigating them.  06-3681, Dkt. 34.  T.D. Farrell argues that the default judgment against Town & Country, coupled with Schreiber's role and responsibilities within Town & Country, establish that she is a trustee under the Texas Construction Trust Fund statute.  And, Schreiber's failure to pay the Third Tier Subcontractors, in conjunction with the significant distributions to herself and Robinson, demonstrate that she misapplied the funds.  Accordingly, T.D. Farrell claims that Schreiber is personally liable for the debt and discharge of the debt should be disallowed.  *Id.* T.D. Farrell then briefly addresses the other claimed exceptions to discharge under sections 523(a)(6) and 727.

### 4. The Bankruptcy Court Rulings & Schreiber's Motion to Deny Standing

The bankruptcy court denied T.D. Farrell's motion for summary judgment and granted Schreiber's motion for summary judgment.  06-3681, Dkt. 54.  The court concluded that T.D. Farrell

failed to establish Schreiber's liability for the debt, primarily due to T.D. Farrell's reliance on the collateral estoppel effect of the Nueces County judgment and corresponding failure to provide competent summary judgment evidence.[10]   Therefore, the court concluded that T.D. Farrell failed to establish an essential element of its case.   *Id.*

In addressing the exceptions to discharge under section 727, the bankruptcy court found that, without having established the requisite debt or being an officer of the estate, T.D. Farrell lacked standing to bring the cause of action under section 727(a)(2)(B).   But, the court noted that "[f]act issues preclude[d] grant[ing T.D.] Farrell's motion for summary judgment on the remaining issues." Then, the bankruptcy court ordered Schreiber's motion for summary judgment be granted and dismissed T.D. Farrell's causes of action under sections 523(a)(4), 523(a)(6), and 727(a)(2)(B).   *Id.*

T.D. Farrell moved for reconsideration, submitting revised examination transcripts and certified copies of the judgment and findings of fact and conclusions of law from the Nueces County court.[11]   *See* Dkt. 57.   In the order on rehearing, the bankruptcy court focused on the applicability of the doctrine of collateral estoppel, finding that T.D. Farrell failed to raise a triable issue as to whether Schreiber controlled, or was in a position to control, Town & Country's defense in the previous litigation.   The bankruptcy court concluded that Schreiber did  not have an opportunity to fully and fairly litigate the issues in the Nueces County action.   Dkt. 59.   Again, the court denied T.D. Farrell's motion for summary judgment, and granted summary judgment in favor of Schreiber on T.D.

---

[10] The examination and depositions initially submitted were not signed or notarized.   Additionally, an affidavit was not provided to authenticate other summary judgment evidence.   *See, e.g.*, Dkt. 34, Exs. A, I, J.

Counsel placed the blame squarely on a young associate at his firm.   But, under the rules of professional conduct, an attorney is always liable for the work of junior attorneys and staff when he or she supervises.

[11] Although there is a flaw in the court reporter's authentication of Schreiber's examination, which can be "waived" by stipulation of the parties, no objection was made by Schreiber and, in fact, Schreiber has also cited to the same testimony.

Farrell's causes of action arising under 11 U.S.C. § 523(a)(4) and (a)(6) and 11 U.S.C. § 727(a)(2)(B).  *Id.*

Schreiber then filed a motion to deny T.D. Farrell's standing to pursue its objections to discharge.  Dkt. 63.  T.D. Farrell, without waiving any prior objections or conceding on the merits, acknowledged that the law of the case, per the bankruptcy court's previous orders, eliminated T.D. Farrell's standing.  Dkt. 66.  Accordingly, in a hearing before the bankruptcy court.  Schreiber's motion was granted.[12]

**C. Issues on Appeal**

On appeal, T.D. Farrell challenges both the denial of summary judgment in its favor and the granting of summary judgment in favor of Schreiber.  T.D. Farrell argues that the court erroneously determined that collateral estoppel did not prevent Schreiber from relitigating the issues presented to and decided by the Nueces County court.  Dkt. 3.  Additionally, because section 727 claims must be brought by a creditor or officer of the estate, when the bankruptcy court found T.D. Farrell failed to establish the requisite debt, it simultaneously eliminated T.D. Farrell's standing to bring claims under section 727.  *Id.*  Therefore, T.D. Farrell requests that, if summary judgment cannot be granted in its favor, standing to bring its claims under sections 523 and 727 be reinstated.  *Id.*

## II. ANALYSIS

**A. Standard of Review**

When exercising appellate jurisdiction, district courts review bankruptcy court's findings of

---

[12]  The court's ruling is reflected in the court minutes.  Although Schreiber was to submit a proposed order, she did not.  The bankruptcy court indicated to the parties that no further or formal order would be forthcoming.  Therefore, this court reviews the bankruptcy court's order based on the entry in the docket, without insight into the bankruptcy court's reasoning in granting the order.

fact for clear error and conclusions of law *de novo*.  *Coburn Co. of Beaumont v. Nicholas* (*In re Nicholas*), 956 F.2d 110, 111 (5th Cir. 1992).  Appeals from bankruptcy court rulings on motions for summary judgment are reviewed *de novo*.  *Miller v. J.D. Abrams Inc.* (*In re Miller*), 156 F.3d 598, 601 (5th Cir. 1998).

In considering T.D. Farrell's motion for summary judgment, the bankruptcy court concluded that the state court judgment did not have preclusive effect against Schreiber in the discharge proceedings.  Like summary judgment rulings, "[a] bankruptcy court's decision to give preclusive effect to a state court judgment is a question of law that [is reviewed] *de novo*."  *Gober v. Terra + Corp.* (*In re Gober*), 100 F.3d 1195, 1201 (5th Cir. 1996).

**B. Standard for Summary Judgment**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment and no defense to the motion is required. *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

The creditor bears the burden of proving the elements of an exception to discharge under 11 U.S.C. § 523 by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654 (1991); *see also Raspanti v. Keaty* (*In re Keaty*), 397 F.3d 264, 271 (5th Cir. 2005); *Hanson v. Kelly* (*In re Kelly*), 385 B.R. 877, 884 (Bankr. S.D. Tex. 2008) ("The preponderance of the evidence standard applies to all § 523 actions."). Applying the law to the instant case, T.D. Farrell bears the burden of demonstrating the elements of the exception. Therefore, in Schreiber's motion for summary judgment, she can point to the absence of a genuine issue of material fact with respect to at least one element T.D. Farrell must establish at trial. T.D. Farrell must then present evidence to demonstrate the existence of a genuine issue of material fact in order to avoid summary

14

judgment in favor of Schreiber.  In contrast, in T.D. Farrell's cross-motion for summary judgment, T.D. Farrell must present evidence to show that no triable fact exists with respect to the required elements of its claims.  In order to avoid summary judgment in favor of T.D. Farrell, Schreiber must then demonstrate a genuine issue of material fact.  However, if T.D. Farrell fails to meet its burden, then Schreiber is not required to rebut the evidence of T.D. Farrell.  Therefore, from a denial of summary judgment for one party, it does not automatically follow that summary judgment should be granted in favor of the other party.

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the nonmovant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*,  754 F.2d 1212, 1221 (5th Cir. 1985).

### C. Collateral Estoppel

T.D. Farrell argues that the judgment and findings from the Nueces County ligation should be given preclusive effect against Schreiber in the discharge proceedings.[13]   Because this determination largely impacts the summary judgment inquiries in the motions of both parties, it is addressed at the outset of the court's analysis.

"Parties may invoke collateral estoppel in certain circumstances to bar relitigation of issues relevant to dischargeability, although the bankruptcy court retains exclusive jurisdiction to ultimately determine the dischargeability of the debt."  *In re Gober*, 100 F.3d at 1201.  In determining the preclusive effect of a Texas state court, the court is guided by the full faith and credit statute.  *Id.* "[J]udicial proceedings of any court of any . . . State . . . shall have the same full faith and credit in every court within the United States."  28 U.S.C. § 1738.  The court must look to the law of the state that rendered the judgment in determining whether the judgment should be given preclusive effect. *In re Gober*, 100 F.3d at 1201; *Mich. Mutual Ins. Co. v. Forrest* (*In re Pierce Mortuary Colls., Inc.*), 212 B.R. 549, 553 (Bankr. N.D. Tex. 1997).  Therefore, in the instant case, the court applies Texas law to determine the preclusive effect of the default judgment in the Nueces County litigation.

Under Texas law, "[i]n order to invoke the doctrine of collateral estoppel, a party must establish '(1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.'"  *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex. 1990) (quoting *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984)); *Finger v. S. Refrigeration*, 881 S.W.2d 890, 895 (Tex. App.—Houston [1st Dist.] 1994, writ den'd); *see also In re Gober*, 100 F.3d at 1201.

---

[13] Thus, T.D. Farrell invokes the doctrine of collateral estoppel offensively.

### 1. Facts Fully and Fairly Litigated

The determination of whether the facts at issue in the adversary proceeding were fully and fairly litigated is questioned, in part, because Town & Country defaulted after answering the state court petition. "As a general rule, an issue is 'actually litigated' only when it is properly raised by the pleadings, submitted for a determination, and actually determined." *In re Gober*, 100 F.3d at 1203. While some support exists for the argument that a default judgment should not give rise to issue preclusion, the proper focus is on the nature of the default. *See, e.g.*, RESTATEMENT (SECOND) JUDGMENTS § 27 cmt. d (1982) ("In the case of a judgment . . . entered by default, none of the issues is actually litigated."); CHARLES A. WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4442 (1981) ("[E]ssential foundations of issue preclusion are lacking for want of actual litigation.").

"No-answer" default judgments generally do not meet the "actually litigated" test. However, in a "post-answer" default the merits of plaintiff's claim remain at issue. The plaintiff must present evidence in order to meet the burden of proof it would bear at trial. *See In re Gober*, 100 F.3d at 1204; *Garner v. Lehrer* (*In re Garner*), 56 F.3d 677, 680 (1995). In order for a post-answer default to "serve as the basis for collateral estoppel in a subsequent bankruptcy proceeding," it must be based on evidence presented to the court. *Pancake v. Reliance Ins. Co.* (*In re Pancake*), 199 B.R. 350, 354–55 (Bankr. N.D. Tex. 1996) (citing *In re Garner*, 56 F.3d at 680, in which collateral estoppel was applied when the defendant defaulted by failing to appear for trial after having answered).

In the instant case, the Nueces County court held a trial in the absence of Town & Country. Although the state court judgment reflects that evidence was presented, the mere assertion that the "evidence and arguments of counsel" were heard is insufficient. *In re Pancake*, 199 B.R. at 355.

17

Here, no transcripts from the trial have been submitted, thus the court cannot determine what evidence was actually presented to and considered by the court at trial.

### 2. Facts Essential to the Judgment in the First Action

[C]ollateral estoppel only precludes the relitigation of identical issues of fact or law which were actually litigated and essential to the prior judgment.  The Restatement (Second) of Judgments § 27, comment (i) (1982) provides in part, "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone."

*Eagle Properties*, 807 S.W.2d  at 721–22 (internal citations omitted).  The issue in the instant case is "narrower that those posed by the underlying state court action;" it is "whether the debt evidenced by the state court judgment arose out of [Schreiber's alleged conduct against T.D. Farrell] while [she] was one of its fiduciaries."  *In re Pancake*, 199 B.R. at 356.  While the Nueces County judgment finding Town & Country liable for violations of the Texas Construction Trust Fund statute clearly binds Town & Country, the record does not reflect that Schreiber's conduct or intent was considered in, much less was "essential" to, the state court's conclusion.

### 3. Parties Cast as Adversaries

Additionally, because Schreiber was not a named party in the Nueces County litigation, the preclusive effect of the state court judgment is questioned. However, to invoke the doctrine of collateral estoppel, mutuality of parties is not required.  Rather, the doctrine serves to bind those who have "had their day in court" either as a party *or a privy*.  *Eagle Props.,* 807 S.W.2d  at 721.  "A party is in privity with another if (1) the party controlled an action, (2) its interests were represented by a party to the action, or (3) it is the successor in interest of a party to an action."  *Fincher v.*

*Wright*, 141 S.W.3d 255, 261–62 (Tex. App.—Fort Worth 2004, no pet.); *see also In re Pierce Mortuary Colls., Inc.*, 212 B.R. at 555.   "There is no general definition of privity, and the determination of who are privies requires a careful examination into the circumstances of each case." *Tex. Capital Sec. Mgmt., Inc. v. Sandefer*, 80 S.W.3d 260, 265 (Tex. App.—Texarkana 2002, pet. struck).   The parties must share a common legal interest that is the subject of the litigation; merely sharing an interest in the same question or providing the same facts is not sufficient to establish privity.   *Fincher*, 141 S.W.2d at 261–62 (citing *Mayes v. Stewart*, 11 S.W.3d 440, 449 (Tex. App.—Houston[14th Dist.] 2000, pet. denied)); *see also In re Pierce Mortuary Colls., Inc.*, 212 B.R. at 555.   The party to the first suit must be "so closely aligned with the nonparty's interests as to be his 'virtual representative.'"   *In re Pierce Mortuary Colls., Inc.*, 212 B.R. at 554 (quoting *Royal Ins. Co. of America v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1297 (5th Cir. 1992)).

"Federal courts have held stockholders and officers are not in privity to their corporations." *Tex. Capital Sec. Mgmt., Inc.*, 80 S.W.3d at 266 (citing *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) and *Am. Range Lines, Inc. v. Comm'r of Internal Revenue*, 200 F.2d 844, 845 (2d Cir. 1952)). "[A] party's status as a director or officer [does not] automatically make[ ] the party a privy . . . ." *Id.* (noting, also, that the court found no case with a contrary holding).   "This status does not automatically show the parties had control over the prior action or that their interests were represented by a party to the action.   The question of privy revolves around the prior cause of action, not the time of injury."   *Id.* (internal citation omitted).   The fact that the prior party and non-party desire the same result does not suffice to create a relationship of privity.   *See In re Pierce Mortuary Colls., Inc.*, 212 B.R. at 555.

Here, it is clear that Schreiber is not a successor in interest.   Thus, Schrieber could be a privy of Town & Country only if she controlled the action or her interests were represented by Town &

Country.  Since Schreiber resigned from Town & Country in July or August 2004, she was no longer employed by or affiliated with Town & Country at the time of trial, November 15, 2004, or when final judgment was entered, January 14, 2005.  06-3681, Dkt. 57, Ex. F.  Further, the pleadings do not indicate that Schreiber was implicated in any way in the Nueces County suit and her examination testimony indicates that she possessed little, if any, knowledge of the state court proceedings.  For example, Schreiber believed Town & Country was the plaintiff in the suit, she was not apprised of the trial date, and did not participate in the selection of Town & Country's counsel.  Moreover, Schreiber is altogether unmentioned in T.D. Farrell's state court petition and the Nueces County court's judgment, findings of fact, and conclusions of law.  *See* 06-3681, Dkt. 57, Ex. F-1.  Under these circumstances, the court concludes that Schreiber was not in privity with Town & Country with respect to the Nueces County suit.  In conclusion, the court finds the application of collateral estoppel improper in the adversary proceeding.

### 4. Evidentiary Value

Although collateral estoppel does not apply, that does not render the Nueces County court's judgment wholly irrelevant to the instant case.  The judgment is evidence of the debt owed, jointly and severally, by Town & Country.  Some circuits have held that civil judgments rendered by another court are hearsay to the extent that they are offered for the truth of the matters asserted therein.  *See, e.g.*, *United States v. Sine*, 493 F.3d 1021 (9th Cir. 2001).  However, the Seventh Circuit acknowledges that:

> Since judgments are often given conclusive effect in subsequent litigation, through the doctrines of res judicata and collateral estoppel, it is a little hard to understand why they should not be allowed to have merely evidentiary effect, if for some reason not all the requirements of res judicata or collateral estoppel are fulfilled. A practical reason for denying them evidentiary effect is, however, the difficulty of weighing a judgment, considered as

evidence, against whatever contrary evidence a party to the current suit might want to present. . . . The analytical difficulties posed by efforts to use a judgment as evidence are, however, the only good reasons offered for the rule . . . , and as they are of less or no force where, as in this case, the trial is not to a jury, we are not sure the rule should apply in such cases. . . . In addition, there is always the catch-all exception to the hearsay rule to fall back on. *See* FED. R. EVID. 803(24). "A [hearsay] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness" is admissible, subject to conditions that in fact are satisfied here.

*Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567 (7th Cir. 1987) (alteration in original). Based on the reasoning of the Seventh Circuit, the judgment should be permitted as evidence of Town & Country's debt to T.D. Farrell arising, in part, from violations of the Texas Construction Trust Fund statute. But, it does not follow that the findings of fact and conclusions of law are also admissible for the truth of the matters asserted. Therefore, T.D. Farrell's attempt to impute findings of fact and conclusions of law relating to Codding and Town & Country from the Nueces County judgment to Schreiber personally in the discharge proceeding fails. *See* Dkt. 41.

Similarly, from evidence demonstrating a debt against Town & Country, it is not axiomatic that Schreiber is personally liable for the debt. However, the judgment against Town & Country may be coupled with other evidence to demonstrate that Schreiber is personally liable for the debt. Ultimately, Town & Country's obligation has been decided, and that finding cannot be relitigated by Schreiber in the bankruptcy proceeding. In contrast, Schreiber's personal liability for Town & Country's debt has not been determined, and may be ascertained by the bankruptcy court.[14]

The primary vehicle that T. D. Farrell relies on to establish Schreiber's personal obligation is the Texas Construction Trust Fund statute, the provisions of which extend liability to individuals

---

[14] Alternatively, presuming that the stayed litigation against Schreiber and Robinson personally alleges violations of the Texas Construction Trust Fund statute, the bankruptcy court conceivably could lift the stay and allow the state court to determine Schreiber's liability. The state court could also make very specific findings of fact for the bankruptcy court to consider in determining the dischargeability. *See* Jeff Bohm, *Barring Discharge Of Judgment Debts In Bankruptcy Through Collateral Estoppel*, TEX. B. J., Nov. 1985, at 1204, 1208–09..

for misapplication of construction trust funds.[15]  In support of this argument, Schreiber testified that she was an officer of Town & Country.  And, in particular, Schreiber signed numerous checks on the account of Town & Country.  Therefore, considering the contractual agreements in place on the Home Depot Project, she was involved, to some degree, in the distribution of funds received from T.D. Farrell through Monitor Trust.

Further, there are questions regarding Schreiber's failure, as Secretary of Town & Country, to maintain and retain records for the Home Depot Project, and Town & Country generally.  In conclusion, genuine issues of material fact exist regarding Schreiber's personal liability, which prevent granting summary judgment in favor of either party.

**D.     Schreiber's Motion for Summary Judgment & T.D. Farrell's Cross-Motion for Summary Judgment**

Although bankruptcy is designed to give debtors a fresh start, the code nonetheless outlines exceptions to this policy.

> Section 523(a)  exempts from bankruptcy discharge certain kinds of debts owed to specific creditors. . . .  Conversely, § 727 denies discharge of all the debtor's debts.  Thus, the rights of all creditors of the debtor at issue are protected under § 727.  The underlying purpose of § 727 is to protect the integrity of the bankruptcy system by denying a bankruptcy discharge to a debtor who engages in certain, specified, objectionable conduct that is of a magnitude broader than injury to a single creditor.

*Ford Motor Credit Co. v. Randall Shane Johnson* (*In re Standing Order with Reasons Regarding Objections to Discharge under 11 U.S.C. § 727 and Purported Settlement of Actions*), 272 B.R. 917, 920–21 (Bankr. W.D. La. 2001) (internal citations omitted).  A creditor can bring valid claims under both sections, and may be uniquely positioned to bring the section 727 claims, in particular, if it

---

[15] The Texas Construction Trust Fund statute is addressed in further detail in conjunction with the section 523(a)(4) analysis.

possesses knowledge of a debtor's conduct that would prevent discharge of debt owed to other creditors that are unaware of the alleged conduct.  In reviewing both parties' motions for summary judgment, the court must narrowly construe exceptions to discharge, in favor of the bankrupt.  *See Murphy v. Robinson Inv. Co. v. Cross* (*In re Cross*), 666 F.2d 873, 879–80 (5th Cir. 1982).

### 1. 11 U.S.C. § 523(a)(4)

In order to establish an exception to discharge under § 523(a)(4), the movant must show the existence of a fiduciary duty that was breached by fraud or defalcation."[16] *Guerriero v. Kilroy*  (*In re Kilroy*), 354 B.R. 476, 493 (Bankr. S.D. Tex. 2006) (citing *Schwager v. Fallas* (*In re Schwager*), 121 F.3d 177, 184 (5th Cir. 1997)); *see also* 11 U.S.C. § 523(a)(4).

"Significantly, the scope and concept of a fiduciary duty under § 523(a)(4) is a matter of federal law." *Serv. Steel Warehouse Co. v. Kannard* (*In re Kannard*), Adversary No. 06-5002, 2008 WL 509290, *3–4 (Bankr. E.D. Tex. Feb. 22, 2008) (citing *Angelle v. Reed* (*In re Angelle*), 620 F.2d 1335, 1338 (5th Cir. 1980)).   The trust relationship must be "technical" or "express," and not arise by implication from a contract; however, the Fifth Circuit recognizes that "trust-type obligations" may be imposed by statute.  *LSP Inv. P'ship v. Bennett* (*In re Bennett*), 989 F.2d 779, 784–85 (5th Cir. 1993);  *see also Winn v. Holdaway*  (*In re Holdaway*), 388 B.R. 767, 774–75 (Bankr. S.D. Tex. 2008); *Green v. Green* (*In re Green*), 352 B.R. 771,775–76 (Bankr. W.D. La. 2005).  State law can be consulted in ascertaining whether the requisite trust exists.  *See Gupta v. E. Idaho Tumor Inst.* (*In re Gupta*), 394 F.3d 347, 350 (5th Cir. 2004).  Although"the definition of 'fiduciary' under

---

[16] Section 523(a)(4) also prevents discharge if the debt arises from embezzlement or larceny.  However, T.D. Farrell does not appear to allege that Schreiber committed fraud or embezzlement.

§ 523(a)(4) is controlled by federal common law rather than Texas law, it is clear that the federal common law definition is even narrower than the Texas definition." *In re Miller*, 156 F.3d at 602.

Once it is determined that the necessary trust exists, the court assesses the scope and nature of the relationship. *In re Kilroy*, 354 B.R. at 493; *see also In re Miller*, 156 F.3d at 602. The debtor's trust duties "must arise independent of any contractual obligation, and 'must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong." *Tex. Lottery Comm'n v. Tran* (*In re Tran*), 151 F.3d 339, 342 (5th Cir. 1998).

The inquiry then turns to whether the duty was breached by fraud or defalcation. "Defalcation is defined as 'a willful neglect of duty, even if not accompanied by fraud or embezzlement.'" *In re Kilroy*, 354 B.R. at 493 (quoting *In re Schwager*, 121 F.3d at 182) (internal quotations omitted). Ultimately, the standard is one of recklessness. *Id.* (citing *Office of Thrift Supervision v. Felt* (*In re Felt*), 255 F.3d 220, 226 (5th Cir. 2001)); *see also In re Green*, 352 B.R. at 776. "[W]illfulness is evaluated objectively," therefore, the fiduciary is "'presumed to know his legal obligations.'" *Id.* at 493–94 (quoting *In re Felt*, 255 F.3d at 227). The court must determine "what a reasonable person in the debtor's position knew or reasonably should have known," "without regard to an analysis of [her] actual intent or motive." *In re Green*, 352 B.R. at 776.

In the instant case, T.D. Farrell predominantly argues that the Texas Construction Trust Fund statute, Tex. Prop. Code § 162.001 *et seq.*, creates the trust and is the basis for the existence of a fiduciary duty to which § 523 refers. Therefore, the "essential element of [the] inquiry continues to be 'determining what *fiduciary* duties are imposed on the fund holder and the manner in which the state's statutory construction funds 'trust' interacts with the Bankruptcy Code debt discharge exception for these debts arising from fiduciary activities." *In re Nicholas*, 956 F.2d at 113.

Section 162.001 of the Texas Construction Trust Fund statute converts payments into trust funds if they "are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contact for the improvement of specific real property in the state."  Tex. Prop. Code § 162.001(a).  Further, "[a] contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds."  Tex. Prop. Code § 162.002.  "A trustee who, intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the funds."  Tex. Prop. Code § 162.031.

In *Boyle v. Abilene Lumber, Inc.*, the court held "that an earlier version of  Texas Construction Trust Fund Statute created a fiduciary relationship under § 523(a)(4) only if the funds were diverted 'with the intent to defraud.'"  *In re Nicholas*, 956 F.2d at 111; *see also Boyle v. Abilene Lumber, Inc.*, 819 F.2d 583 (5th Cir. 1987).  Notwithstanding the court's holding in *Boyle*, in *In re Nicholas*, the Fifth Circuit addressed whether subsequent amendments to the statute altered the analysis.  "The holding in *Nicholas* has recently been cited as the Fifth Circuit's definitive statement of the law regarding whether a fiduciary relationship arises under the Texas Construction Trust Fund statute for purposes of section 523(a)(4) of the Bankruptcy Code."  *LVR Carpet Ctr, Inc. v. Coley* (*In re Coley*), 354 B.R. 813, 816 n.3 (Bankr. N.D. Tex. 2006).

The statute, as amended, "imposes criminal penalties on trustees who misapply construction trust funds."  *In re Nicholas*, 956 F.2d at 111.  The post-*Boyle* amendments clarified what constitutes a "misapplication" of funds.  *Id.* at 112.  Specifically, the scienter requirement has been broadened, such that:

> A trustee who, intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds has misapplied the trust funds.

*Id.*; *see also* Tex. Prop. Code § 162.031(a).  Additionally, the trustee has available several affirmative defenses, which restrict a trustee's potential liability.[17]  The court ultimately concluded that "the Texas Construction Trust Fund Statute creates fiduciary duties encompassed by 11 U.S.C. § 523(a)(4) *only to the extent that it defines wrongful conduct* under the statute.  Because the scope of such wrongful conduct has been broadened by the legislature's amendments to the statute, § 621.031, the *potential grounds for nondischargeability have also broadened*." *In re Nicholas*, 956 F.2d at 114 (emphasis added); *see also Bartley Tex. Builders Hardware, Inc. v. Swor* (*In re Swor*), Adversary No. 07-3280, 2008 WL 938940, *6 (Bankr. S.D. Tex. Apr. 4, 2008) ("[The Texas Construction Trust Fund Statute] does not elevate every contractor who accepts construction funds or loans to a section 523(a)(4) fiduciary.  It does so only to the extent that the statute defines wrongful conduct.").  "[N]o breach of fiduciary obligation occur[s] if the funds [are] used to pay bills necessary to keep the business operating, even if the trustee paid creditors who were not beneficiaries of the trust fund (i.e. were not parties who could lien the construction project), so long as the payments that were made were payments necessary to keep the projects or the company going."[18]

---

[17] For example, it is an affirmative defense that the trustee had a reasonable, good faith belief that the beneficiaries, i.e. the third tier subcontractors, were not entitled to receive the funds.  *In re Nicholas*, 956 F.2d at 112; *see also* Tex. Prop. Code § 162.031.

[18] "The statute does not impose a strict trust obligation on the trustee as it includes an affirmative defense to a trustee's liability for misapplication, by using the proceeds 'to pay the trustee's actual expenses directly related to the construction.'  The statute does not prohibit the use of construction trust funds to pay bills necessary to keep the business operating (including overhead and other 'directly related' expenses), even if the trustee paid creditors who were not beneficiaries of the trust fund."  *Bartley Tex. Builders Hardware, Inc. v. Swor* (*In re Swor*), Adversary No. 07-31188-H3-7, 2008 WL 938940, *6 (Bankr. S.D. Tex. Apr. 4, 2008).  "Further, the Texas Attorney General has concluded that the affirmative defense allows a contractor to pay funds out for overhead and other expenses, even if they are not readily traceable, as long as they were actually incurred."  *Id.* (citing Op. Tex. Att'y Gen. No. JM-945 (1988).

26

*Wittig Grass Sales, L.L.C. v. Cimarolli* (*In re Cimarolli*), Adversary No. 04-3250, 2006 WL 209212, *4 (Bankr. S.D. Tex. July 11, 2006). "If, however, trust funds were knowingly or intentionally paid for *more* than the actual expenses, or for expenses *not* 'directly related' to the construction or repair project, criminal sanctions could be imposed, and *Boyle* renders such actions subject to nondischargeability." *In re Nicholas*, 956 F.2d at 113.

In the instant case, the contracts between T.D. Farrell and Monitor Trust, and subsequently between Monitor Trust and Town & Country, show that the payments at issue were for the improvement of real property, specifically the construction of the Home Depot in Corpus Christi, Texas. Additionally, as an admitted officer of a subcontractor, with signatory authority on the subcontractor's account, Schreiber may fall within the statutory definition of a trustee, by either having received trust funds or having control over the direction of trust funds. *See* Tex. Prop. Code § 162.002.

Additionally, the court finds there is sufficient evidence at this point to create a genuine issue of material fact as to whether Schreiber misappropriated funds. First, there is a genuine issue as to Schreiber's intent in making the distributions to herself and Robinson. Schreiber's knowledge of the industry reflects an awareness of the liens that would attach if the Third Tier Subcontractors went unpaid for materials or services provided on the Home Depot Project. From the pattern of significant distributions and industry knowledge, one reasonably could infer that the necessary intent exists. As astutely observed by one of the parties, "[t]he grant of summary judgment on discharge motions is ordinarily not granted since such motions usually involve questions of motive and intent, where material issues of fact might exist as to the debtor's motive." Dkt. 42. "Proving a knowing and fraudulent intent is not a simple matter, for rare will be the debtor who provides direct evidence of his fraudulent intent. Instead, fraudulent intent is most often found by relying on inferences drawn

27

from a course of conduct." *See McNally v. Echart* (*In re Echart*), 374 B.R. 596, 599 (Bankr. E.D. Tex. 2007) (addressing intent as it relates to exceptions to discharge under 11 U.S.C. § 727).

Second, Schreiber maintains that the payments made to herself and Robinson were a combination of loan payments and, in the case of Robinson, expenses and consulting fees. However, in addition to the uncertainty regarding the legitimacy of the "loans," whether those payments would be considered "related to" the construction project is also at issue.

Weighting of testimony and issues of credibility are inappropriate considerations for summary judgement, but may properly be determined by the trial court. *Cf. In re Cimarolli*, 2006 WL 209212, at *5 ("Although [debtors] testified that all funds [the company] received from its customers were used to pay expenses of the business, that testimony is not credible.  It is not credible because the business and financial affairs of the company were so poorly recorded, monitored, and managed that the Court does not believe that they could know where the money went.").  In conclusion, based on the current record, the court finds genuine issues of material fact that preclude granting summary judgment to either party at this point.


### 2. 11 U.S.C. § 523(a)(6)

Similarly, § 523(a)(6) prevents discharge of an individual debtor if the debt is "for willful and malicious injury by debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  "The term 'willful' means deliberate or intentional."  *Theroux v. HSA Mortgage Co.* (*In re Therous*), No. 94-50530, 1995 WL 103342, at *3 (5th Cir. Feb. 27, 1995) (citing S. Rep. No. 95-989, 95th Cong., 2d Sess. 79 (1978); H. Rep. No. 95-595. 95th Cong., 2d Sess. 365 (1978); and *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241, 245 (5th Cir. 1983)); *see also In re Garner*, 56 F.3d at 681.  In interpreting the word "willful," the Supreme Court has held that:

The word "willful" . . . modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *act* that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead, "willful acts that cause injury."

*Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S. Ct. 974 (1998); *see also Raspanti v. Keaty* (*In re Keaty*), 397 F.3d 264, 270 (5th Cir. 2005).  Congress did not define "malicious," but the courts apply an objective standard and interpret the term to mean that a debtor acted without just cause or excuse. *In re Therous,* 1995 WL 103342, at *3; *see also In re Green*, 352 B.R. at 777.

Additionally the Fifth Circuit has noted that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."  *In re Green*, 352 B.R. at 777 (quoting *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598, 606 (5th Cir. 1998)) (internal quotations omitted); *see also In re Keaty*, 397 F.3d at 270.

For the reasons outlined previously, in particular the summary judgment evidence relevant to Schreiber's intent and knowledge of the construction industry, genuine issues of material fact exist for necessary elements of the § 523(a)(6) exception to discharge.  Therefore,  summary judgment cannot be granted for either party.

### 3. 11 U.S.C. § 727

T.D. Farrell maintains that Schreiber is not entitled to a discharge of the alleged debt, pursuant to 11 U.S.C. § 727, because Schreiber allegedly made false sworn statements in connection with the bankruptcy, is unable to explain the loss of substantial assets, and is unable to produce books and records to corroborate her allegations as to the sources and disposition of her assets.  06-3681, Dkt. 34.  Although the bankruptcy court ruled with respect to T.D. Farrell's objection to discharge pursuant to section 727(a)(2)(B), it did not address the merits of T.D. Farrell's exceptions

under sections 727(a)(3), (a)(4)(A), (a)(5), or (a)(7).  The bankruptcy court did, however, observe that "[f]act issues preclude[d] grant[ing] of [T.D.] Farrell's motion for summary judgment on the remaining issues."  The court, therefore, understands the bankruptcy court to have included them in the "remaining issues" that were set for trial, and concurs with the bankruptcy court's finding.  *See* 06-3681, Dkts. 54, 59.  Because the bankruptcy court has not ruled explicitly on these claims, and because T.D. Farrell has standing to pursue its claims, as explained below, the objections to discharge under section 727 are remanded for further proceedings.

**G. Standing of T.D. Farrell to Assert Claims**

> [A]ccording to the Fifth Circuit, standing in a discharge action all boils down to whether there is still a chance of the alleged creditor having an allowed claim; if there is still a chance, then the party has standing under [Section 727].  If, on the other hand, the alleged creditor's 'claim' has been finally adjudicated and disallowed, then it has no standing to prosecute a discharge objection. . . . Case law is unambiguous that  a dispute with regard to a creditor's claim does not divest it of standing to pursue a discharge objection.

*8400 N.W. Expressway, L.L.C. v. Morgan*  (*In re Morgan*), 360 B.R. 507, 515 (Bankr. N.D. Tex. 2007) (addressing standing in the context of section 727(c)(1) and citing multiple cases from the Eight Circuit and the Northern Districts of Illinois and Texas).  Because the claim in the instant case is disputed, as discussed previously, and also because T.D. Farrell's claims under section 523 have been reinstated, the court finds that T.D. Farrell possesses standing to pursue its discharge objections.

## III. Conclusion

While the court affirms the denial of summary judgment for T.D. Farrell and reverses the grant of summary judgment for Schreiber, the decision does not reflect upon the relative merits of each party's case.  The court concludes only that genuine issues of material fact preclude granting summary judgment in favor of either party at this point in the proceedings.  Thus, the court AFFIRMS the bankruptcy court's denial of T.D. Farrell's motion for summary judgment and REVERSES the grant of summary judgment for Schreiber.  Therefore, the case  is REMANDED to the bankruptcy court for further proceedings in accordance with this opinion.

Signed at Houston, Texas on November 3, 2008.

Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY

31